**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-

GREG SCHRECENGOST,

Plaintiff,

v.

DEPUTY ETHAN POWERS, in his individual capacity,
ELIAS GONZALEZ, in his individual capacity,
SERGEANT MICHAEL RAIRDON, in his individual capacity, and
LARIMER COUNTY.

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Greg Schrecengost, by and through his attorney Sarah Schielke The Life & Liberty

Law Office in Loveland, CO, respectfully alleges for his *Complaint and Jury Demand* as follows:

### I. INTRODUCTION

1. At 10:55 am in the morning on Wednesday, March 2, 2022, Defendant Deputy Ethan Powers

   and his ride-along buddy, jail deputy Elias Gonzalez, both of the Larimer County Sheriff's

   Department, beat up, tased, arrested, and falsely charged with multiple baseless crimes Plaintiff

   Greg Schrecengost because they happened to be bored and because Mr. Schrecengost had the

   audacity, when they began violating his rights, to tell them "no." Defendants Powers and

   Gonzalez personally participated in these violations of Mr. Schrecengost's constitutional rights

   under the Fourth, Fourteenth and First Amendments to the U.S. Constitution. Defendant

   Rairdon, the supervising sergeant who subsequently arrived on scene, failed to intervene, failed

   to report the unlawful use of excessive force, and then he assisted Defendants Powers and

Gonzalez in attempting to cover up their misconduct by having Mr. Schrecengost maliciously and wrongly criminally prosecuted. All Defendants' conduct revealed unconstitutional customs, practices and policies at the Larimer County Sheriff's Office as well as failures to train and supervise which were driving forces behind the officers' misconduct.

2. Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983 for Defendants' violations of Plaintiff's rights as guaranteed by the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, and pursuant to § 13-21-131, C.R.S. for Defendants' violations of Plaintiffs' rights guaranteed by Article II, Section 7 of the Colorado Constitution.

3. The Defendants' actions caused Plaintiff Mr. Schrecengost to endure multiple contusions on his body, false arrest, pain, permanent injury, suffering, humiliation, emotional distress, damage to his reputation, attorneys' fees, and other damages.

## II. JURISDICTION AND VENUE

4. The federal claims in this action arise under the Constitution and laws of the United States and are brought pursuant to 42 U.S.C. § 1983. The state claims in this action arise under the Constitution of the State of Colorado and are brought pursuant to section 13-21-131 of the Colorado Revised Statutes.

5. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and 1343(a)(3).

6. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988 and § 13-21-131(3), C.R.S.

7. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado or were directed at individuals within the State of Colorado.

### III. PARTIES

8. Plaintiff Gregory Schrecengost is a resident of the State of Colorado. He resides in Red Feather Lakes, Larimer County, Colorado presently and at all times relevant to this Complaint.

9. Defendant Larimer County Sheriff's Office Deputy Ethan Powers ("Deputy Powers") was at all times relevant to this complaint duly appointed and sworn as a police officer working for the Larimer County Sheriff's Office. Deputy Powers is a named Defendant in his individual capacity.

10. Defendant Elias Gonzalez was at all times relevant to this complaint duly appointed and sworn as a peace officer as defined by § 24-31-901(3), C.R.S., employed as a noncertified deputy sheriff for the Larimer County Sheriff's Office.

    a. Further, at all times relevant to this complaint, Defendant Gonzalez was acting under color of law. He performed the actions of law enforcement, at the direction of law enforcement, identified himself as law enforcement, wrote a report in his capacity as law enforcement, and thereafter, he sought and received worker's compensation benefits for injuries he claimed he received while acting under color of law as law enforcement throughout this incident.

    b. Nothing Gonzalez did with or to Plaintiff was in a civilian capacity.

11. Defendant Larimer County Sheriff's Office Sergeant Michael Rairdon was at all times relevant to this complaint duly appointed and sworn as a police officer working for the Larimer County Sheriff's Office. Sergeant Rairdon is a named Defendant in his individual capacity.

12. Defendant Larimer County was at all times relevant to this Complaint a Colorado municipality.

## STATEMENT OF FACTS

13. Plaintiff Greg Schrecengost, born in Kansas, is a 52-year-old disabled Army veteran. Prior to this case, he had no criminal record.

14. Mr. Schrecengost lives alone in the very rural, deeply wooded home he and his brother built by hand in Red Feather Lakes, CO. He has had girlfriends from time to time in his life, but he has never been married and he has no children. A bit awkward, he is a kind, introverted, loner type of a man. He has several close friends who adore him, and to whom he is fiercely loyal.

15. After a difficult childhood, Mr. Schrecengost grew into a man who kept to himself but who also, as a point of personal principle would not hesitate to stand up to a bully. He prides himself on hard work.

16. At age 20 in 1991, Mr. Schrecengost joined the Army. He had closely followed the Gulf War and wanted to do his part serving and fighting for America. He served for 7 years before being honorably discharged in 1998. He has a number of injuries from his military service. He has several severely herniated discs in his lower back, tinnitus and hearing loss, and permanent nerve damage in his left hand.

17. Worth mentioning here is that the nerve damage to Mr. Schrecengost's left hand was the result of being stuck incorrectly by medical personnel with needles. While still in the Army, Mr. Schrecengost collapsed from heat stroke during a military exercise. While trying to revive him, medical staff inadvertently double-stuck intravenous (IV) catheters into his cephalic vein, which caused permanent (and painful) damage to the radial nerve in Mr. Schrecengost's left hand.

18. After the Army, Mr. Schrecengost went into armored truck driving. As an armored car driver, he received specialized training on self-defense techniques for hand-to-hand combat/assault

scenarios. The trainings Mr. Schrecengost received were specifically oriented to teaching drivers how to parry and stall attackers and would-be armored truck robbers using just his hands and ordinary objects long enough for back up, police, or other assistance to arrive.

19. Mr. Schrecengost greatly enjoyed this self-defense training. He had been picked on as a kid and had always suffered from a somewhat scrawny build. Learning these self-defense methods helped him feel more solid, resilient, and empowered.

20. Even so, Mr. Schrecengost grew increasingly anxious about the prospect of being attacked or shot while working as an armored carrier (the growth of the internet made it far more commonplace to hear stories of such events) and in 2010 he decided to switch careers into being a machinist and handyman, which he has done ever since.

21. On the morning of March 2, 2022, Mr. Schrecengost was startled awake at 9:00 am by his phone ringing. He had tossed and turned the whole night having great difficulty sleeping due to pain in his back (he actually had an appointment at the V.A. scheduled for that later that very day), and now his boss was calling to ask him to come in to work on his off day to repair a fixture that had broke. It was a Wednesday, and it was not off to a very good start.

22. Exhausted and with everything hurting, Mr. Schrecengost rolled out of bed, threw on his jacket, grabbed his wallet, flashlight, tobacco, and rolling papers (he handrolls his cigarettes), and then he got into his old 2002 maroon Saturn SL to being the long drive (90 minutes) from his home in the woods of Red Feather Lakes back into civilization.

23. Unbeknownst to Mr. Schrecengost, right around this same time, Larimer County Deputy Ethan Powers and his Larimer County jail deputy buddy, Elias Gonzalez (who was purporting to accompany Deputy Powers as a civilian ride-along) were out patrolling around looking for stuff to do. Powers and Gonzalez weren't just pals, they were also neighbors. They lived across

the street from each other. They knew each other and they knew one another's families and they had even had BBQs together.

24. Gonzalez had expressed interest in leaving his job as a jail deputy for LCSO in order to move up into being certified as a patrol deputy. He was doing a ride-along with Deputy Powers to get a sense of what the job was like. Deputy Powers was eager to show off. He wanted to make what he did for a living every day look cool and interesting.

25. Unfortunately, the thing about 6:30 am shift on Wednesdays is that when it comes to police work… it tends to be pretty *un*interesting.

26. Even so, apparently, Gonzalez was rapt. He would testify 2 years later[1] that he remembered everything they did that day, as he found it all just so fascinating. The day started with an early morning call out to investigate a "robbery" (Gonzalez's word) that had happened the night before. Gonzalez testified that Deputy Powers drove them out to the scene of the crime and while there, Powers talked to upset family members and even called out an evidence tech to dust for fingerprints.[2]

27. Having nothing else to do, after they wrapped up their call for service on the car break-in sometime around 8:30 am, Gonzalez and Powers began driving back to the LCSO station. Apparently, (again, this is according to Gonzalez's testimony) on the way to the station they were able to come up with something more interesting to do.

---

[1] LCSO jail deputy Elias Gonzalez testified at the jury trial held in Mr. Schrecengost's criminal case on February 14, 2024.
[2] In response to some follow-up questions from defense counsel at trial, Mr. Gonzalez admitted that it was not a "robbery" they had responded to; it was a car break-in that had happened overnight which resulted in the loss of some personal items that had been left in the car.

28. Specifically, they decided to stop at a creek and, as Gonzalez put it, "remove a transient" who was sleeping in a small tent on the creek's embankment.

29. Powers's and Gonzalez's idea to wake and evict the homeless individual in the creekside tent apparently did not go so well. For starters, they were on the wrong side of the creek. Rather than take the time to go cross the creek at one of its many bridges, Powers and Gonzalez decided to try and fjord it on foot. Doing this (and staying dry) involved very careful steps and leaps atop rocks and logs. Deputy Powers was able to do it, but Gonzalez was not. Gonzalez slipped on a log, causing both his feet to plunge into the water.

30. Powers felt bad. Fjording the creek had been his idea, and now because of him, his pal Gonzalez had slipped, wrecked his shoes, and very well could have seriously hurt himself. Powers got to the tent and roused the person sleeping inside. Gonzalez, with soaking wet socks and squishy shoes growing colder by the second, watched with growing impatience, eager to wrap this folly up and head back to LCSO where he could swap out for dry socks and shoes.

31. At approximately 9:30 am, they did. They drove back to LCSO. They spent about 40 minutes hanging at the station waiting for a call for service. Not much was happening. Deputy Powers then proposed that they head out and do his favorite thing of all: some "traffic enforcement."

32. Deputy Powers had just finished a year as a LCSO "DUI Officer." He later testified that he loved working "traffic enforcement" far more than doing regular patrol or calls for service, and that his time as the "DUI Officer" had led him to now proudly treat "every single traffic stop that [he does] as a DUI investigation."

33. Upon information, belief, and reasonable inferences from the events that followed, Powers and Gonzalez came up with a plan: They'd head back up towards Welling to look for a traffic violation on one of the rural county roads. When they spotted one on a vehicle of someone

who looked unlikely to be well-off (and therefore improbable to have the resources to ever hold the deputies accountable for what they were about to do), they'd stop that car using the traffic violation as pretext, and Powers would pull the driver out of the car and run him through roadside tests for Gonzalez to watch.

34. Mr. Schrecengost, traveling east on County Road 70 in his 2002 maroon Saturn, was still making his way to work. He had gotten stuck behind a truck that was going extremely slow and well under the speed limit. When he got the first lawful opportunity to do so, Mr. Schrecengost passed the truck and continued on his way.

35. Just as he finished his lawful pass and was back in his lane, Deputy Powers and Gonzalez passed him going the opposite direction. Powers saw that Mr. Schrecengost's Saturn did not have a front plate affixed to it.

36. As it happens, 2002 Saturn SLs did not come with a front license plate bracket. Here is a photo of Mr. Schrecengost's car that day:



37. Mr. Schrecengost had been driving his 2002 Saturn SL for years. He had never once been stopped for a missing front plate.

38. That would all change today. Deputy Powers quickly flipped an illegal U-turn, and then sped (unlawfully, as his red and blue lights were not activated as he did so) past multiple cars to catch up to Mr. Schrecengost to stop him.

39. This was not a particularly safe area for Deputy Powers to be weaving in and out of traffic trying to catch up to Mr. Schrecengost's Saturn. He was undeterred. After two miles and several minutes of effort, he finally got behind Mr. Schrecengost and threw on his overhead red and blue lights to initiate a stop.

40. While following Mr. Schrecengost, Deputy Powers observed no bad driving or other indicators of impairment.

41. Mr. Schrecengost immediately, safely, and without indication of impairment submitted to that show of authority and pulled over.

42. Much of the event described herein was captured on Deputy Powers's bodyworn camera (BWC) video. This video is in two parts, has been attached as **Exhibit 1** – Powers Traffic Stop Part 1 and **Exhibit 2** – Powers Traffic Stop Part 2, both of which have been filed as conventional exhibits and are incorporated by reference into this Complaint.

43. Deputy Powers's driving was so disruptive and noticeable that both Mr. Schrecengost and the semi tractor-trailer in front of him pulled over for the traffic stop.

44. Deputy Powers went up to Mr. Schrecengost's window. He (Powers) initially did not seem to notice or care that he had also pulled over a large tractor trailer in front of Mr. Schrecengost. Mr. Schrecengost gestured to the truck and himself and politely inquired if Powers was intending to pull him or the trucker over. Deputy Powers interrupted his question and rudely

said "I'm talking to *you.*" He then said "do you have your license with you??" while simultaneously waving off the tractor trailer.

45. Mr. Schrecengost responded "yes" to the question of whether he had his license with him. Deputy Powers, impatient and eager to get to the roadsides part of the stop, demanded Mr. Schrecengost give the license to him.

46. Deputy Powers's behavior in just these first few seconds of interaction was so curt and intense that it caused Mr. Schrecengost to become concerned. He said to Powers, "what's wrong?" Deputy Powers quickly replied, "you don't have a front plate on the car, you're wearin' headphones while you're drivin'."

47. Mr. Schrecengost picked up the headset from his passenger seat and showed to Deputy Powers that it was the type with a microphone, permitted in vehicles, which he used to make phone calls for work.

48. Deputy Powers interrupted Mr. Schrecengost and told him he still had to have a front plate on the car. He did not wait for a response and immediately demanded to know where Mr. Schrecengost was headed.

49. Mr. Schrecengost told him he was headed to work and handed him his license.

50. Deputy Powers took the license and continued asking Mr. Schrecengost questions ("What do you do for work?" and "Do you live in Red Feather still?").

51. It is normal protocol and proper police procedure (for officer safety) for an officer to:

    a. Run a driver's name and DOB through dispatch to make sure the driver has no open warrants and has a clear and valid license; and

b. If the officer decides to run the driver through roadside tests, to call for a cover officer to assist.

52. It is also normal protocol (and common sense) to request that the driver provide their registration and proof of insurance at the outset of a traffic stop, particularly in a case where the vehicle has been stopped for a traffic offense that relates to registration (like missing a front plate).

53. Deputy Powers quite deliberately did none of these things. He didn't care who Mr. Schrecengost was, whether he had warrants, whether his car was registered, or anything else. He and his buddy Gonzalez were now 5+ hours into this ride-along and he still hadn't been able to show him anything cool yet. He just wanted to get to the roadsides.

54. And so, a mere 47 seconds after meeting Mr. Schrecengost, Deputy Powers ordered Mr. Schrecengost to step out of his vehicle.

55. This surprised Mr. Schrecengost and he asked what the problem was. Deputy Powers told Mr. Schrecengost he needed to get out of the car so he could continue questioning him away from the road.  Having no choice, Mr. Schrecengost complied.

56. Powers directed him to walk even further to the rear of the car. Mr. Schrecengost complied. His exit was normal. His walk was normal.

57. Once out of the car, Deputy Powers immediately asked Mr. Schrecengost how much alcohol he had to drink that day. Mr. Schrecengost told him the truth: "None."

58. Undeterred, Deputy Powers pressed on. He asked him next when was the last time he had smoked marijuana. Mr. Schrecengost responded "never."

59. Deputy Powers's fishing expedition continued. He next asked Mr. Schrecengost if he took prescription medications "for anything."

60. This encounter just was getting more and more bizarre. Mr. Schrecengost told Powers he did take one prescription. Mr. Schrecengost what the prescription was. Mr. Schrecengost told him that he took Motrin and Diclofenac which is an ointment for his back.

61. During this questioning, Mr. Schrecengost put his unconventional wallet into his pocket and was holding his cigarette holder in his left hand.

62. Deputy Powers next aggressively asked Mr. Schrecengost about his cigarette holder and demanded he show it to him. Mr. Schrecengost showed Deputy Powers the holder and pulled a cigarette out.

63. Deputy Powers misread the label on Mr. Schrecengost's rolling papers (it said "OCB") and next accused him of having CBD papers. Mr. Schrecengost showed Powers that he was reading the label incorrectly.

64. Mr. Schrecengost went to light his cigarette. Powers told Mr. Schrecengost to not smoke his cigarette.

65. Mr. Schrecengost asked why he couldn't smoke his cigarette. Powers replied, "because I'd prefer that you not smoke while we're talking."

66. They were just two minutes into this encounter when Powers ordered Mr. Schrecengost not to smoke his cigarette.

67. Deputy Powers next abruptly said, "you mind if I look at your eyes for a minute?" This made no sense to Mr. Schrecengost. Wasn't he already looking at his eyes? He asked him that question.

68. Deputy Powers ignored Mr. Schrecengost's question and asked his own again: "is it okay if I look at your eyes for a minute? This is a yes or no question." Mr. Schrecengost said no. Mr. Schrecengost then stated, "This is starting to feel confrontational."

69. For context, here's what Deputy Powers looked like while he was interrogating Mr. Schrecengost that day:



70. Deputy Powers ignored Mr. Schrecengost's concern and instead asked for the third time if he could look at his eyes. Mr. Schrecengost again told Powers no.

71. Deputy Powers then told Mr. Schrecengost "I think I'm smelling alcohol on your breath, okay? So what I want to make sure of is that it's safe for you to be driving, I could be wrong, okay?" He then asked if Mr. Schrecengost would perform roadside maneuvers.

72. This didn't make any sense to Mr. Schrecengost. He didn't smell like alcohol. He hadn't been drinking. And this cop claimed to have pulled him over for a missing front license plate. Not for impaired driving. It was 10:54 am on a Wednesday for heaven's sake.

73. Mr. Schrecengost declined to do the roadside maneuvers.

74. Deputy Powers did not desist. He continued stating that he could smell alcohol and now demanded that he provide a preliminary breath test. Mr. Schrecengost was dumbfounded by whatever it was that Deputy Powers was up to. He told Deputy Powers he was done with this encounter, he needed to leave to go to work, and that he was not comfortable with how aggressive Deputy Powers was being.

75. Deputy Powers carried on demanding that Mr. Schrecengost do roadside tests over 6 times, ignoring each time Mr. Schrecengost saying no. Mr. Schrecengost told Deputy Powers he wanted to leave.

76. Deputy Powers, growing desperate, and seeing his chance to show off doing roadsides to Gonzalez slipping away, kept pressing Mr. Schrecengost. "Why won't you do a PBT?" he asked.

77. Mr. Schrecengost replied quite bluntly: "Because I don't consent to *any* of this shit."

78. At this point, Gonzalez had gotten out of the patrol car and begun to creep up towards Mr. Schrecengost on the other side of him. Meanwhile, Mr. Schrecengost's back side abutted a ditch. He was trapped.

79. Deputy Powers told Mr. Schrecengost he would not allow him to leave until Mr. Schrecengost "confirmed that it's safe for [him] to drive." He then began throwing accusations about alcohol odor and drinking at Mr. Schrecengost, while interrogating him more. Mr. Schrecengost denied all the accusations without hesitation and without even the remotest indication of impairment.

80. In addition to his general impatience with Mr. Schrecengost, Deputy Powers was growing mad at Mr. Schrecengost. Mr. Schrecengost was not capitulating to his show of authority in front of Gonzalez and it was starting to feel a bit embarrassing.

81. Meanwhile, for Mr. Schrecengost, the encounter was reaching untenable levels of bizarre and terrifying. He began to walk away, but he did not make it one step. Deputy Powers, unwilling to tolerate another second of perceived disrespect in front of Gonzalez, immediately grabbed Mr. Schrecengost's arm and snarled, "we're gonna have a problem if you walk away from me, don't do that."

82. Mr. Schrecengost told Powers to not grab him (Powers had grabbed Mr. Schrecengost's injured left arm, by the way). Powers kept hold of Mr. Schrecengost's arm and yelled into his face, "DON'T WALK AWAY FROM ME. WE'RE NOT DONE HERE."

83. At the moment Deputy Powers went hands on Mr. Schrecengost's person, he had:

   c. Not told him he was under arrest;

   d. Not told him he was being detained;

   e. Not previously told him he was not free to leave; and

   f. Had not told him that he was not allowed to walk or move freely in the space on the side of the road.

84. Mr. Schrecengost looked to Gonzalez for help. He looked like he might be a supervisor watching. He said to him, incredulous, "are you observing this??" Gonzalez said nothing, while creeping closer to Mr. Schrecengost.

85. Every bone in Mr. Schrecengost's body was telling him that he was in danger. Frantically, he demanded to know if Powers's BWC was recording what they were doing to him.

86. Powers didn't respond. Instead, he escalated up to the next notch, and bellowed at Mr. Schrecengost: "TAKE YOUR HANDS OUT OF YOUR POCKETS. TAKE YOUR HANDS OUT OF YOUR POCKETS NOW."

87. Mr. Schrecengost had had one hand resting on his pocket for the *entire* encounter with Deputy Powers previously, and Powers hadn't cared.

88. Suddenly, now, it was all Powers needed to get this escalated the next notch up. If he couldn't show Gonzalez a good time with roadsides, he'd show him how to take a suspect down and put him in cuffs.

89. Deputy Powers began screaming wildly at Schrecengost ordering him to take his "hands" out of his pockets.

90. Mr. Schrecengost didn't move. He stared at Powers in disbelief. He again asked Gonzalez to intervene. Gonzalez stayed silent and continued to slowly close in.

91. Then Powers called out "cover code 3" on his radio and then instantly and violently grabbed Mr. Schrecengost again. He attempted to employ a pain-compliance maneuver known as a rear wristlock on Mr. Schrecengost's disabled left hand. He screamed out "PUT YOUR HANDS BEHIND YOUR BACK NOW."

92. Mr. Schrecengost recoiled in pain and pulled his arm back.

93. Both Powers and Gonzalez converged on Mr. Schrecengost's person. Powers was able to slam him to the ground. Gonzalez dove over Mr. Schrecengost's legs, held them on the ground in a bear hug, and began groping around Mr. Schrecengost's waistband, pockets, and groin area.

94. Mr. Schrecengost screamed out for help. He continued to exclaim that the deputies were assaulting him. He feared for his life. He believed they were going to kill him. Relying on his self-defense training from when he was an armored truck driver, he did the only thing he could: he parried and grabbed Powers's hands so that they could not reach his gun and shoot him. He tried to defend himself for as long as he could for someone to show up and save him.

95. Deputy Powers caused his BWC camera to be knocked off its magnet when he slammed Mr. Schrecengost to the ground. The camera fell behind Mr. Schrecengost's head, giving a small glimpse of Mr. Schrecengost's perspective during this assault:



96. Deputy Powers shouted at Mr. Schrecengost to "put your hands behind your back do it now" and "roll over." Because Gonzalez's extremely large person was entirely atop his lower half and holding his legs, Mr. Schrecengost was not physically able to do either of these things.

97. Deputy Powers didn't care. This was the part where everyone at LCSO would agree he should get to use his Taser.

98. Deputy Powers unholstered his Taser and from inches away, fired the probes into Mr. Schrecengost's body and electrocuted him.

99. Axon (the manufacturer of Tasers) trains that you should absolutely never deploy probes at this close of range on a subject, as it carries an unacceptable risk of permanent injury. This is not the type of training that anyone at LCSO, Deputy Powers especially, cared about, however.

100. The probes went into Mr. Schrecengost's ribs and electrocuted him. He screamed out in pain. Deputy Powers kept yelling for him to roll over (which he could not do) and he feared that Powers would grab his gun next. He summoned all that he had left to try and prevent Powers's hands from reaching his gun.

101. Powers tried to assault Mr. Schrecengost with the Taser gun. Mr. Schrecengost blocked the Taser with his hand and pushed it to the side.

102. At some point Gonzalez decided he was done holding Mr. Schrecengost's lower half so that Powers could have his way with him. He dropped the legs, stood up, grabbed one of Mr. Schrecengost's arms, and flipped Mr. Schrecengost's body over to his stomach and into the ditch.

103. Powers put Mr. Schrecengost's hands in handcuffs. Gonzalez clamored back atop him. Mr. Schrecengost prepared to be shot in the back of the head. He screamed to cars passing by for help.

104. Gonzalez pressed his weight down upon Mr. Schrecengost's back, forcing Mr. Schrecengost's entire body to painfully contort down into the ditch.



105.    This quite naturally made breathing extremely difficult for Mr. Schrecengost. He cried out
        that he was unable to breathe. Deputy Powers and Gonzalez ignored him and continued to hold
        the fully restrained Mr. Schrecengost down.

106.    LCSO Sergeant Cherry arrived on scene after a few minutes and approached. He did not
        relieve purported "civilian ridealong" jail deputy Gonzalez of duty. Instead, he had the deputies
        pick Mr. Schrecengost up and then conduct a complete patdown search of his person while he
        looked on.

107.    Two more LCSO deputies arrived. None of them took over for Gonzalez. Gonzalez
        maintained control of Mr. Schrecengost's person and escorted him to the patrol car where he
        told Mr. Schrecengost to spread his legs and used his foot to hold them apart while he and
        Powers conducted yet another patdown search of Mr. Schrecengost.

108.    One of the now on-scene LCSO deputies kicked a piece of trash on the road while Gonzalez
        continued to perform various tasks and duties of law enforcement under color of law:



109.    With four other LCSO deputies/sergeants looking on, Deputy Powers and his pal Gonzalez

switched sides and searched Mr. Schrecengost's person some more. Mr. Schrecengost tried in

vain to explain to each LCSO deputy and sergeant that arrived that Deputy Powers and

Gonzalez had just assaulted him. He warned everyone there that they had a "real lawsuit on

their hands."



110.    Deputy Powers and Gonzalez put Mr. Schrecengost into the back of Powers's patrol car.

111.    Deputy Powers was in a bit of a pickle. It was not lost on him that anyone to watch his BWC video was going to get the impression that he and Gonzalez had just assaulted, tackled, tased, and then arrested a guy for not having a front license plate. It did not look good.

112.    Making matters worse, Mr. Schrecengost had just announced that he was going to sue him.

113.    Deputy Powers had literally *just* settled a previous civil lawsuit that had been filed against him for using excessive force three months earlier.[3] Now here he was, the ink on the settlement documents probably not yet even dry, and he had picked up another lawsuit.

---

[3] On January 8, 2019, Deputy Powers responded to a noise complaint at Bret Hanson's home in Berthoud. Mr. Hanson had apparently been in his own backyard yelling and blowing into a horn. Powers arrived with another deputy, parked his patrol car in Mr. Hanson's driveway, illuminated the whole of Mr. Hanson's house with his spotlights, and began approaching Mr. Hanson's front door. Mr. Hanson came out the front door and said, "who the fuck are you?" Neither Deputy Powers nor the other deputy with him identified themselves. Mr. Hanson turned and went back

114.    Deputy Powers knew that his career was over if there wasn't something in Mr. Schrecengost's blood to substantiate his completely baseless DUI arrest. With Mr. Schrecengost closed in his car, he and four other LCSO deputies and sergeants muted their microphones and began talking about how they'd need to do this.

115.    When making a DUI arrest in Colorado, by law, police officers are required to offer the driver a choice of chemical test. The driver can choose an immediate and less intrusive breath test, or a more intrusive blood test.

116.    Deputy Powers knew he could not risk Mr. Schrecengost selecting a breath test. If he did, and no alcohol was found, he'd be in big trouble right away. If he could coerce Mr. Schrecengost into doing a blood test, though, he'd get to control and manipulate the vials and they'd be able to search it for every other possible drug.

117.    So, he needed Mr. Schrecengost's blood. That's all there was to it. Deputy Powers walked back to his patrol car, opened the door, and read Colorado's Express Consent law to Mr. Schrecengost with *one* little change: he did not give Mr. Schrecengost a choice of breath test. Instead, he told him his choices were to submit to a blood draw or refuse testing.

118.    This was a clear and obvious violation of Colorado's Express Consent law and long-established case law setting forth law enforcement's statutory obligation to provide the driver

---

into the residence. Deputy Powers pulled out his firearm and began firing shots at Mr. Hanson and into the interior of his house. He fired at least 5 shots, and several of his bullets went into Mr. Hanson's kitchen and nearly hit 2 other residents. Deputy Powers would later falsely claim that he "saw Mr. Hanson get a gun." Similar to here, half the LCSO police force leapt in to assist Powers with covering up his own crimes by helping make it look like his victim had committed crimes. All the criminal charges they lodged against Mr. Hanson were eventually dismissed. Larimer County settled Mr. Hanson's federal civil suit December 2021. See *Brett Hanson v. Larimer County et al.*, 20-cv-00317-RBJ.

with a choice of chemical test. Powers knew what he was doing, and made sure to lie in his police report later and claim that he had offered both tests to Mr. Schrecengost.

119.    Mr. Schrecengost, who happened to be quite averse to needles on account of having permanent painful nerve damage in his left hand *from* needles, asked for a lawyer and for a different officer. Powers shut him in the patrol car.

120.    Multiple Larimer County Sheriff deputies arrived on scene. They all stood around Deputy Powers's patrol vehicle, while Mr. Schrecengost was handcuffed inside, with muted body worn camera videos, laughing and joking with one another.

121.    They called for a K9 unit to respond and perform a sniff for drugs on Mr. Schrecengost's car. The K9 unit did not alert and the K9 officer informed all the deputies they did not have probable cause to search the vehicle. The deputies laughed and then searched the car anyway and claimed it was an inventory search prior to tow.

122.    Eventually, Powers and Gonzalez transported Mr. Schrecengost to the hospital for medical clearance. Taser probes were still in Mr. Schrecengost's body and he was plainly injured on his right and left sides.

123.    Once there, Deputy Powers, Gonzalez, and multiple other LCSO deputies went into the hospital break room to begin working on their reports and the cover-up.

124.    Deputy Powers took as long as possible to write a one page application for electronic search warrant to obtain Mr. Schrecengost's blood. The application contained multiple false statements including the claim that Mr. Schrecengost had an odor of alcohol on his breath and that his speech was "slurred."

125.   Mr. Schrecengost complied with the blood draw done by search warrant. This was highly traumatic to Mr. Schrecengost due to his fear of needles and the pre-existing permanent nerve injuries he had from needles.

126.   The phlebotomist finished drawing Mr. Schrecengost's blood and handed the vials to Deputy Powers.

127.   Deputy Powers took the vials and put them in a blood kit box which he then stashed in his car.

128.   Mr. Schrecengost's blood kit went missing for three weeks. No one at LCSO or elsewhere can account for its whereabouts during this time.

129.   Also during this time, LCSO Sergeant Riordan directed Deputy Powers to pretend his shoulder had been injured when he attacked Mr. Schrecengost and to go get some X-rays and physical therapy to make it look believable. Deputy Powers obliged Riordan's request.

130.   No where in Powers or Gonzalez's reports (or anyone's, until months later) is there a report, mention, or claim of injury to Deputy Powers or jail deputy Gonzalez. No where on video can either one be seen favoring any part of their body or appearing to be in pain.

131.   Gonzalez recognized the opportunity for what it was soon enough as well. A week later, he claimed that he had herniated a disc in his back when he was arresting Mr. Schrecengost. He requested that his medical expenses, mileage, massages, and physical therapy appointments be covered by Larimer County's worker's compensation and reimbursed to him because (he claimed) to have sustained the injuries while assaulting Mr. Schrecengost, which he believed fit the definition of "working for Larimer County."

132. Deputy Powers ultimately charged Mr. Schrecengost with DUI, Resisting Arrest, Felony Disarming a Peace Officer, Obstructing a Peace Officer and Unlawful Display of License Plate.

133. The Larimer County District Attorney's Office subsequently amended the charges to *Attempt* to Disarm a Peace Officer, Obstructing, Resisting Arrest, and Unlawful Display of License Plate.

134. Mr. Schrecengost entered not guilty pleas to all of the charges and set the matter for trial. He subsequently pleaded guilty to the license plate violation.

135. The Larimer County District Attorney's Office – watching Powers's video and being well aware of the problems with this case – made sure that Gonzalez's worker's compensation claim was specifically attached as a restitution claim in Mr. Schrecengost's criminal case so that he would have the spectre of over $17,000 in a restitution penalty hanging over his head if he persisted in taking the case to trial.

136. Over two months later, in May 2022, Sergeant Roirdan wrote a supplemental report into the case to say that Powers's shoulder had been injured.

137. When he testified at Mr. Schrecengost's jury trial, Sergeant Roirdan could not remember what he had told Powers to claim for his injury and guessed (incorrectly) that it was his ribs.

138. According to Sergeant Riordan's trial testimony, it is LCSO policy that police reports must be written as soon as possible, ideally at the end of shift, and if that is not possible, then by no later than 7 days after the arrest.

139. When defense counsel pointed out that Sergeant Riordan, apparently in violation of that policy, did not write his own report regarding something as serious as an officer being injured in this case until more than two months later, Sergeant Riordan shrugged.

140.     Mr. Schrecengost had a four-day jury trial on February 13-17, 2024. He asserted the affirmative defense of self-defense to all the charges except the DUI charge.

141.     At Mr. Schrecengost's trial, Deputy Powers testified that people he arrested had told him they were going to sue him for using excessive force so many times that he could not keep count.

142.     At Mr. Schrecengost's trial, Deputy Powers claimed that he put Mr. Schrecengost's blood kit in the mail to Colorado Bureau of Investigation (CBI) "at some point" but that he could not remember when.

143.     At Mr. Schrecengost's trial, Deputy Powers stood up to proudly demonstrate to the jury some of the features of his Taser gun, and without warning grabbed it out of his holster and pointed it in Mr. Schrecengost's direction. Mr. Schrecengost's body jolted in the chair instinctively in terrified reaction. Mr. Schrecengost then appeared to quietly have a brief panic attack as Powers continued on talking about all the neat features of his Taser. He got himself mostly under control with very few people noticing, and as he did so, several tears fell silently from Mr. Schrecengost's face.

144.     The jury ultimately acquitted Mr. Schrecengost of the felony Attempt to Disarm charge, and hung on the Resisting Arrest and DUI charges.

145.     The Larimer County District Attorney's Office continues to expend significant county resources, time, and energy in pursuit of convicting Mr. Schrecengost of DUI in the apparent misguided belief that if they can secure such a conviction, they will limit their exposure from the LCSO deputies' misconduct in the instant lawsuit.

146.    To this end, the Larimer County District Attorney's Office has avowed to retry the hung charges and the matter is set for retrial on May 14-17, 2024.

147.    Mr. Schrecengost's life was upended by Powers's wrongful arrest, Powers and Gonzalez's roadside assault, and theirs and LCSO's malicious prosecution. Mr. Schrecengost spent 2 days in jail and then was released on felony bond which required him to submit to daily/random drug and alcohol testing and not possess any firearms.

148.    These oppressive bond conditions were made all the more oppressive by the fact that Mr. Schrecengost is poor, lives 90 minutes away from civilization, and requires the ability to possess firearms in order to protect his animals from predators and protect himself from the same.

149.    Mr. Schrecengost was and remains utterly traumatized by his injuries and losses from that day. He no longer feels safe anywhere. He lost 20 pounds. He previously had great trust for law enforcement and authority and now has no idea if there's anyone he can trust. Every morning Mr. Schrecengost wakes up and has to realize he is still living in a waking nightmare, where the country he served and spent his a decade of the prime of his life protecting has betrayed him and taken from him all the liberties that he holds so dear.

150.    Mr. Schrecengost is a shell of his former self.

151.    Mr. Schrecengost has been humiliated and physically injured by Deputy Powers and jail deputy Gonzalez.

152.    It is unofficial custom and practice at the Larimer County Sheriff's Office for deputies, sergeants, and entire chain of command to assist other deputies in covering up arrests made without probable cause.

153.    It is unofficial custom and practice at the Larimer County Sheriff's Office for deputies, sergeants, and entire chain of command to assist other deputies in covering up their uses of excessive force.

154.    The two unofficial customs and practices listed above were the moving causal force in Deputy Powers's decision to wrongfully arrest Mr. Schrecengost and then assault him by using various forms of excessive force.

155.    As a result of the Defendants' violations of his constitutional rights under both the U.S. and Colorado Constitutions, Plaintiff Mr. Schrecengost has suffered damages, trauma, depression, and suffering that has destroyed his ability to work, caused him lost wages, left him filled with unease and anxiety, and devastated his enjoyment of life.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST SET OF CLAIMS FOR RELIEF
Section 13-21-131, C.R.S. – Unreasonable Seizure
*Excessive Force, Wrongful Arrest*
Violation of Colorado Constitution, Article II, Section 7
(against Defendant Powers and Defendant Gonzalez)

156.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

157.    Defendant Powers was a peace officer under Colo. Rev. Stat. § 24-31-901(3), employed by the Larimer County Sheriff's Office at the time he wrongfully seized, arrested and assaulted Mr. Schrecengost.

158.    Defendant Gonzalez was also a peace officer under § 24-31-901(3), employed by the Larimer County Sheriff's Office as a noncertified jail deputy and acting as the same at the time he wrongfully seized, arrested, and assaulted Mr. Schrecengost.

159. Plaintiff Mr. Schrecengost had a protected interest under the Colorado Constitution, article II, § 7 in being secure in his person and property from unreasonable seizures by law enforcement personnel.

160. Deputy Powers unreasonably seized Mr. Schrecengost and utilized excessive force in shoving, assaulting, tasing and detaining Mr. Schrecengost, in violation of the Constitution of the State of Colorado.

161. Defendant Gonzalez, acting under color of law, also unreasonably seized and arrested Mr. Schrecengost, and utilized excessive force in assaulting and detaining Mr. Schrecengost, in violation of the Constitution of the State of Colorado.

162. Deputy Powers and Defendant Gonzalez unreasonably seized Mr. Schecengost when they handcuffed him and charged him with crimes he did not commit. Deputy Powers did not at any time in his encounter with Mr. Schrecengost have probable cause to believe that Mr. Schrecengost had committed a crime.

163. Deputy Powers and jail deputy Gonzalez did not at any time have a warrant authorizing their seizure of Mr. Schrecengost.

164. Deputy Powers and Defendant Gonzalez violated Mr. Schrecengost's state constitutional rights by engaging in an unlawful seizure of Mr. Schrecengost that was objectively unreasonable in light of the facts and circumstances confronting him before, during and after their encounter with Mr. Schrecengost.

165. Defendant Powers and Defendant Gonzalez knowingly violated Mr. Schrecengost's individual rights secured by the bill of rights of the Colorado Constitution.

166. Defendant Powers and Defendant Gonzalez did not act upon a good faith and reasonable belief that their actions were lawful.

167. The acts or omissions of Defendant Powers and Defendant Gonzalez were the moving force behind, and the proximate cause of, injuries sustained by Mr. Schrecengost.

168. Defendant Powers's and Defendant Gonzalez's wrongful arrest and humiliation of Mr. Schrecengost caused him to experience extraordinary stress, expense, depression, terror and anxiety. The experience of this event caused and continues to cause Mr. Schrecengost trauma and emotional distress, loss of any feeling of safety or security, along with other damages and injuries described herein.

<u>SECOND CLAIM FOR RELIEF</u>
42 U.S.C. § 1983 – 4th Amendment Violation – Unreasonable Seizure
Excessive Force
(against Defendants Powers and Gonzalez)

169. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

170. When Defendant Powers without probable cause or a warrant, suddenly and without warning grabbed Mr. Schrecengost's arm and twisted it backwards using a painful rear wristlock maneuver, before slamming Mr. Schrecengost into the ground to be assaulted and tased, this was an assault upon Mr. Schrecengost's person, employing excessive force, in violation of the Fourth Amendment.

171. When Defendant Gonzalez, without probable cause or a warrant, suddenly and without warning, joined in on Powers's ground assault of Mr. Schrecengost, and held Mr. Schrecengost's body while Powers tased and handcuffed him, this was also assault upon Mr. Schrecengost's person, employing excessive force, in violation of the Fourth Amendment.

172. No officer would consider the Defendants' sudden and unannounced deployment of painful force upon Mr. Schrecengost to have been reasonable or justified under the circumstances.

173.   Defendants effected their assault and these injuries to Mr. Schrecengost with deliberate indifference to Mr. Schrecengost's rights under the Fourth Amendment to the U.S. Constitution.

174.   Defendants' wrongful arrest of and lengthy assault upon Mr. Schrecengost caused him to experience great physical pain and terror, degradation of personal security, excruciating continued strain to pre-existing injuries, anxiety and trauma, along with the other injuries set forth herein.

<u>THIRD CLAIM FOR RELIEF</u>
42 U.S.C. § 1983 – 4th Amendment Violation – Unreasonable Seizure
False Arrest/Imprisonment
(against Defendants Powers, Gonzalez, and Rairdon)

175.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

176.   When Defendant Powers suddenly and without warning grabbed Mr. Schrecengost's arm, twisted it backwards using a painful rear wristlock maneuver, and then tackled him to the ground to arrest him, he effected a warrantless seizure and arrest of Mr. Schrecengost, without probable cause (or even reasonable suspicion) for such seizure, in violation of the Fourth Amendment.

177.   When Defendant Gonzalez, observing Defendant Powers begin to make an illegal seizure and false arrest of Mr. Schrecengost leapt in to join by bear hugging Mr. Schrecengost's legs, groping all over his groin and waist band, and holding him on the ground, he also effected a warrantless seizure and arrest of Mr. Schrecengost, in violation of the Fourth Amendment.

178.   When Defendant Rairdon arrived on scene, observed Mr. Schrecengost to be unimpaired, and then the hospital watched the video of Powers's arrest and gained personal knowledge of

the absence of probable cause for this arrest, and elected to do whatever he could to help Defendants Powers and Gonzalez cover up this fact and continue their wrongful kidnapping and imprisonment of Mr. Schrecengost, he also effected a warrantless seizure and arrest of Mr. Schrecengost, in violation of the Fourth Amendment.

179. All three Defendants knew that Mr. Schrecengost had committed no arrestable offense, and that he possessed no probable cause for any criminal offense, that Defendant Powers was effecting a retaliatory arrest, and yet they all arrested and unlawfully seized Mr. Schrecengost anyway, with deliberate indifference to Mr. Schrecengost's rights under the Fourth Amendment to the U.S. Constitution.

FOURTH CLAIM FOR RELIEF
Section 13-21-131, C.R.S. – Violation of Due Process
*Malicious Prosecution*
Violation of Colorado Constitution, Article II, Section 25
(against Defendant Powers, Defendant Gonzalez, and Defendant Rairdon)

180. Plaintiff Mr. Schrecengost incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

181. Defendant Powers was a peace officer under Colo. Rev. Stat. § 24-31-901(3), employed by the Larimer County Sheriff's Office at the time he wrongfully seized, arrested and maliciously prosecuted Mr. Schrecengost.

182. Defendant Gonzalez was a peace officer under Colo. Rev. Stat. § 24-31-901(3), employed by the Larimer County Sheriff's Office as a jail deputy at the time he maliciously prosecuted Mr. Schrecengost.

183. Defendant Rairdon was a peace officer under Colo. Rev. Stat. § 24-31-901(3), employed by the Larimer County Sheriff's Office at the time he maliciously prosecuted Mr. Schrecengost.

184.    Section 25 of Article II of the Colorado state constitution guarantees to Mr. Schrecengost the right to not be deprived of life, liberty or property, without due process of law.

185.    Defendant Powers caused the criminal prosecution against Mr. Schrecengost by falsifying facts in his report and his Affidavit for Warrantless Arrest, in an effort to make it more likely to appear there had been probable cause for Mr. Schrecengost's arrest, and providing those documents to the District Attorney.

186.    Defendant Sergeant Rairdon personally participated in and personally directed Defendants Powers and Gonzalez to prepare written reports containing such false statements in an effort to make it appear more likely that probable cause had existed for Mr. Schrecengost's arrest, and directed them to provide those documents to the district attorney.

187.    Defendant Rairdon also prepared a report himself containing false statements two months later alleging Powers had been injured in his attack on Mr. Schrecengost, in an effort to further cover up and distract from Defendants Powers's and Gonzalez's misconduct, which caused Mr. Schrecengost to also be prosecuted for the recovery of over $17,000 of Larimer County-paid worker's compensation claims.

188.    Defendants' false allegations were the sole moving force behind the criminal prosecution against Mr. Schrecengost.

189.    Defendants' actions were done with malice.

190.    No probable cause supported the criminal charges Defendants brought against Mr. Schrecengost.

191.    Defendants' malicious and false prosecution of Mr. Schrecengost caused him to suffer further trauma, damages, lost wages, suffering, depression, and despair.

## FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violation of Fourth Amendment – Malicious prosecution
(against Defendant Powers, Defendant Gonzalez, and Defendant Rairdon)

192.   Plaintiff incorporates all other paragraphs of this Complaint for purposes of this claim.

193.   Defendants caused Mr. Schrecengost's continued confinement in handcuffs and in the patrol car and at the hospital with their unconstitutional malicious actions. Defendant Powers, with Gonzalez's assistance and Rairdon's express direction, also knowingly filed baseless criminal charges against Mr. Schrecengost, out of pure malice against Mr. Schrecengost.

194.   In fact, no probable cause supported the original arrest of Mr. Schrecengost, a fact that was plainly known to all Defendants.

195.   Defendants caused the criminal prosecution against Mr. Schrecengost by writing untruthful reports and thereafter providing them to the District Attorney.

196.   Defendants unlawful actions and false allegations against Mr. Schrecengost were the sole moving force behind the criminal prosecution against Mr. Schrecengost.

197.   Defendant Powers, Gonzalez, and Rairdon concealed and misrepresented facts, as well as outright lied, in their accounts of their encounter with Mr. Schrecengost, in order to ensure Mr. Schrecengost's suffering continued beyond his physical injuries and into the courtroom following release from the jail.

198.   Defendants' actions were done with malice.

199.   No probable cause supported the original arrest, continued confinement, or prosecution of Mr. Schrecengost.

200.   Defendants' conduct proximately caused significant injuries, damages, and losses to Mr. Schrecengost.

## SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violation of Fourth Amendment – *Monell*
### Deliberately Indifferent Policies, Practices, Customs, Training, Supervision and Ratification
### (against Defendant Larimer County)

201.    Plaintiff incorporates all other paragraphs of this Complaint for purposes of this claim.

202.    Larimer County has failed to train and supervise its officers regarding citizens' constitutional First and Fourth Amendment rights, including but not limited to every citizen's right to refuse to submit to questioning and every citizen's right to refuse to perform roadside tests.

203.    Nowhere in any of Larimer County's training materials or official policies and procedures is even a sentence provided that instructs or trains officers regarding citizens' constitutional right to refuse to submit to questioning.

204.    Larimer County's failure to train is deliberately indifferent to the First Amendment rights of citizens like Mr. Schrecengost, and made it both foreseeable and likely that Larimer County deputies would violate First Amendment rights of individuals like Mr. Schrecengost.

205.    Because of Defendant Larimer County's failure to train and supervise its officers regarding the rights of citizens to be free of forced/coerced questioning by its deputies, and because Defendant Larimer County also trained its officers that it could charge citizens with crimes for the exercise of their constitutional rights, individuals like Mr. Schrecengost have been repeatedly subjected to violations of their constitutional rights.

206.    Defendant Powers acted as he did pursuant to and because of the policies and training of Defendant Larimer County.

207.    Defendant Larimer County knew to a moral certainty that occasions would arise when citizens would not want to be subjected to police questioning. Despite this, Larimer County

failed to train its deputies on the constitutional limitations of the use of arrests and violent force on such citizens.

208. Defendant Larimer County has persistently failed to investigate and counsel or discipline its deputies for their similar abuses of power in forcibly detaining and questioning individuals without lawful justification, and in arresting any who do not cow to their lawless coercion. Further, Defendant Larimer County's supervisory officers, to include but not limited to the various supervisory personnel that arrived on scene in this case, have a custom and practice of encouraging, tolerating and ratifying such blatantly illegal conduct. These encouragements, toleration of, and ratifications reveal that Larimer County deputies carry out such police misconduct under the policies and regiment of training provided by Larimer County, and that such conduct is customary within Larimer County.

209. Indeed the behavior of the *ten* (yes – ten) Larimer County Sheriffs' Office deputies, corporals, sergeants and lieutenants who converged on scene after Mr. Schrecengost was illegally arrested and subjected to excessive force and who then all remained involved and assisting at the hospital with the continued wrongful detention and prosecution of Mr. Schrecengost confirms the practice and custom within Larimer County Sheriff's Office is to violently arrest anyone who they don't like, whenever they feel like it, regardless of lacking legal justification for the same. The cover-up effort that followed Mr. Schrecengost's arrest involving all the on-scene officers discussing how they would have a K9 sniff done on Mr. Schrecengost's car and deprive him of a choice of chemical test to ensure they got his blood and then their group adventure to the hospital where they all hung out for another 3 hours in a hospital side room conspiring about how they'd maliciously prosecute Mr. Schrecengost in order to justify Defendant Powers's and Gonzalez's wrongful arrest and use of completely

excessive force upon Mr. Schrecengost reveals that this unconstitutional retaliatory practice is endemic to Larimer County as an institution.

210. Larimer County is responsible for training its officers to ensure they perform their duties consistent with the law and to discipline their improper conduct, so officers can learn from their experiences and be deterred from engaging in future misconduct that violates the constitutional rights of people with whom the police interact. Larimer County's failure to do so has communicated to, and trained, LCSO deputies, including Defendants Powers, Gonzalez, and Rairdon, that excessive force against anyone who is not verbally cooperating is authorized and tacitly (or explicitly) encouraged. The failure to counsel or discipline misconduct constitutes training which causes future similar unconstitutional conduct.

211. Larimer County's past ratification and toleration of similar unconstitutional conduct thus caused and was the moving force behind the Individual Defendants' use of excessive force against Mr. Schrecengost, and Larimer County's failure to discipline the Individual Defendants for this retaliatory arrest and illegal use of force will lead to more unconstitutional conduct.

212. Defendant Larimer County's acts and omissions caused Mr. Schrecengost damages in suffering physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy and sense of security and individual dignity, among other injuries, damages and losses.

213. Defendant Larimer County's actions, as described, deprived Mr. Schrecengost of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law and equity, including but not limited to:

a. Declaratory relief and injunctive relief, as appropriate;

b. Actual economic damages as established at trial;

c. Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, trauma, grief, anguish, stress, fear, anxiety, loss of freedom, loss of liberty, loss of sense of security, and other non-pecuniary losses;

d. Punitive or exemplary damages for all claims as allowed by law in an amount to be determined at trial;

e. Pre-judgment and post-judgment interest at the highest lawful rate;

f. Attorney's fees and costs; and

g. Such further relief as justice requires.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted this 1st day of March, 2024.

THE LIFE & LIBERTY LAW OFFICE

*s/ Sarah Schielke*
Sarah Schielke, #42077
Counsel for Plaintiff
The Life & Liberty Law Office
1055 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980

F: (970) 797-4008
E: sarah@lifeandlibertylaw.com